The next case today is Historic Bridge Foundation et al. v. Pete Buttigieg, appeal number 21-1188. Attorney Furster, please introduce yourself for the record and proceed with your argument. Good morning, your honors. My name is Andrea Furster. I represent the appellants, Friends of the Frank J. Wood Bridge, the Historic Bridge Foundation, and the National Trust for Historic Preservation. I'll be splitting my time with the Counsel for the National Trust, and I would like, with the Court's permission, to reserve one minute for rebuttal. Yes, you may, Ms. Furster. Thank you, your honor. So, my Counsel for the National Trust will be arguing the issue of the failure of the highway agencies to discount the long-term costs of the bridge alternatives to present value, which was an error in the highway agency's determination that the long-term costs of rehabilitating the historic bridge reached extraordinary magnitudes under Section 4F. My focus will be on three specific construction cost items, the cost of erecting structural steel for the rehabilitation alternative, the cost of the new bridge's temporary work trestle, and the $4 million temporary bridge associated with the rehabilitation alternative. And the point I want to emphasize here is that for each of these construction cost items, the agencies rely on deference alone to justify their decisions. And as a result of that, this is the unusual case in which the agency's findings are so implausible that they cannot be attributed to a difference of opinion or the application of agency expertise. But before I go into the specific cost items, I also want to emphasize what is not at issue here. The Frank J. Wood Bridge is called a fracture-critical bridge by design, which is an attribute of all trust bridges. But the record is clear that this bridge can be safely rehabilitated for all design loads. And the record is also clear that the alternative of rehabilitating the historic bridge will satisfy the purpose and need for the project, including safety, capacity, and pedestrian and bicycle mobility. The only issue here before this court is whether the long-term costs of rehabilitating the bridge reach extraordinary— Five minutes, counsel. Thank you. Turning to the costs, I want to make a key point. The district court specifically recognized that several of the costs, particularly the trestle bridge and the cost of erecting structural steel, as well as other costs, were dubious, particularly in light of the current bid documents that show a $21.8 million versus $13 million cost associated with the new bridge. And one cost in particular, the cost of erecting structural steel, the district court found was not supported and had no support in the record before the agency. But a key point that the district court failed to understand was that if you make any of these cost adjustments on the construction side, a remand to the agency is necessary because lifecycle costs include construction and long-term maintenance costs. So, if you reduce the construction costs downward for the rehabilitation alternative or you increase the construction costs for the new bridge, the delta between the lifecycle costs of the rehabilitation alternative and the new bridge shrink. And this is a determination that this court can't make. If you agree that any one of these cost adjustments need to be made, the agency has to make that in the first decision. So, a remand is necessary, would be necessary to determine whether or not those costs are still of extraordinary magnitude. Now, I would like to make three points about- I think it's either way. However, obviously, if the agency failed to discount the cost, if you agree that they should have discounted, then the delta is very small. It shrinks significantly more than it would have otherwise. But the principle certainly is that this court should, you know, and it applies in either case, this court should not in the first instance be making a determination. Could you remind me what the district court's reason for concluding that there was no need to remand to the agency, given your understanding that it found that there was an error with respect to the cost you're describing? Yes, I think the district court, and I believe the agencies agree with me on this point. The district court failed to understand that if you make any adjustment in construction costs, that affects the lifecycle cost differential. And what the district court concluded, the district court separated the issue of construction versus long-term cost and basically said, well, I understand that the difference between the construction cost, the initial cost of the two alternatives are pretty minor and certainly would not be a basis for rejecting the rehabilitation alternative. And since the cost of erecting structural steel is a minor adjustment, he decided that this was harmless error because he did not understand the relationship between construction costs and long-term maintenance costs in computing the full lifecycle. Can you just help me understand it? Just flesh out for me how that works exactly, why the district court's wrong in concluding that it doesn't matter? Sure, and we could also provide the mathematical calculation later. But if you look, and I think the place for you to look would be on joint appendix page, I think it's 485. And that joint appendix shows that how construction costs are a factor in calculating lifecycle costs. So if you make any adjustment, for example, if you subtract, as the district court acknowledged, $600,000 from what they call the $20.9 million in lifecycle costs, you get $20.4 million in lifecycle costs. And then the difference between $20.4 million in the rehabilitation alternative lifecycle costs and the new construction then becomes smaller and it's reduced by about four percentage points. So it gets below 50% difference. So let me ask you two questions on that. Suppose there was an error of $10,000. Are you saying we would have to return it to the agency to find out if that $10,000 made any difference? Yes, I think you would. Suppose it were $100. I mean, I don't think that this court is in a position to make a judgment about what cost is a cost. Can I counsel? And I don't want to encroach on my colleague's time, who will be discussing the lifecycle cost analysis. So let me ask my second question then. As I understand it, the agencies do not think the district court was correct in finding the steel cost inapplicable because they pointed out that the steel cost, even though it's the same steel on both bridges, the factor that we're talking about here includes not just raw materials but labor as well, and that the steel erection project for the replacement bridge was not overly complicated. Doesn't that explanation provide enough for us to defer to? No, and this brings me to an important point that I really wanted to bring to your attention, because there is pretty significant support in the administrative record that completely refutes this argument, which, by the way, wasn't made before the district court. But I'd invite you to turn to Maine DOT's bridge design manual, and that's at our joint appendix at page 73, section 2.2.7. And that directly addresses making cost comparisons for the cost of erecting structural steel. And what that specifically says is, and I'm quoting, the cost of fabricating, delivering, erecting, and finishing each beam is relatively independent of the weight of the beam, though will be slightly higher for heavier beams. So their argument that the truss bridge is lighter and therefore should cost more is completely refuted by their own bridge design manual. And then the other point, addressing your point, is that if you look at their argument, they talk about all the different bolts and connections that they have to make for erecting structural steel for the rehabilitation alternative. But they don't say how many bolts and connections they're going to have to make for the replacement bridge. But elsewhere in the record, and I point you to joint appendix 122, they show that this very heavy temporary work trestle has to be erected and moved 31 times. So clearly that's significant because of this very challenging location. So that's a very significant labor cost that should certainly make the cost of erecting structural steel for the new bridge much greater, not much less than the cost for the rehab alternative. And I would like to, if you don't have any questions on those issues, my colleague will be addressing the life cycle cost analysis cost discounting issue. Just so I understand the thrust of the points you're just making, is the idea that you're saying the district court's rationale was not predicated on any assessment of these record facts and how they would work out, such that it was deferring to the agency, it was just making a categorical conclusion. But you're not disputing that we can. There's no reason to remand to the district court for an assessment of whether the record that you're now pointing us to does or does not provide a reason for concluding that deference to the agency was owed, no matter what the rationale of the district court was. I do agree that you owe no deference to the district court and that your ability to review the record is what it is. There's no more factual development. Correct. But my point was that this argument about the adjusting of the bolts and the heavier labor costs, it's not supported by the record. I think that's the main point I want to give you, that it's a post hoc argument, but you should look at the record references and you will see that there's no record support for that labor argument and it's contradicted by the bridge design. The agency itself did make it in making its 4F ruling. No, only in their brief. Is that a separate argument that you're making, that we have to vacate? Because this argument doesn't provide a basis for deferring since under Chenery, the agency's never articulated that as its ground? That's correct. In their opposing brief, they make an argument about the more labor-intensive cost for erecting structural steel. They cite two specific points in the record, but the record does not support those arguments. But did the agency in issuing its 4F decision, it issued an explanation of why it was ruling as it did, correct? It did not specifically address the structural steel cost. As the district court correctly found, there is no record support for the higher cost. That's not a permissible ground for affirming the agency's decision because we don't know that the agency relied on it. Exactly, and I think the district court was clearly correct that there's nothing in the record supporting that particular cost estimate. With your permission, I'd like to turn it over to my colleague now to address the discounting issue. Yes, please go forward. Thank you. Good morning, Your Honors. I'm Elizabeth Merritt, Deputy General Counsel of the National Trust for Historic Preservation. With regard to the Life Cycle Cost Analysis, or LSTCA, there's a good reason why the universal standard methodology for evaluating the future costs of maintenance and repairs calls for discounting these costs to present value. It's a fundamental principle of economics that $1.10 years from now is worth less than $1 today, and $1.60 or $1.70 years from now is worth even less. All of the FHWA guidance describes this as the standard methodology, and in fact, for bridge projects over $40 million, when there's even more at stake, it's specifically required. Could you explain to us, it was not clear from the briefs, what that present value discount factor was and how it included or didn't include inflation? Because as you point out, $1 today is often seen as worth more than $1.10 years from now, but something that costs $1 today generally costs more than $1.10 years from now because of inflation. How is that factored in? It looks like they took the present costs and ran those into the future without inflating them. That's correct. In our reply brief, we cited a couple of guidelines and cases that say that the inflation issue should be an entirely separate concern. They did not incorporate inflation into their methodology. Let me make sure. Their methodology, on the one hand, didn't incorporate inflation, which meant they got a lower number, but on the other hand, didn't incorporate a discount for return on investment, which would mean they got a higher number. We don't know to what extent the two offset. Usually, when you did it in another lawsuit, you would include both factors. No, you wouldn't. The guidance does not call for adjusting for inflation. Why not? That puzzles me. Could you explain what the rationale behind that would be? I guess I don't know the rationale, but the FHWA manual says adjusting for inflation and discounting are entirely separate concerns and they shouldn't be continued. It won't affect the comparison. Inflation will be constant across them, so there's no need to do it to determine the comparison, correct? Okay, that makes sense. They didn't use it here, but they did. You can't, but the thing that's puzzling here is that it's one thing to say we're going to do discounting and ignore inflation, because inflation won't help us figure out the comparison, but it's strange to not do discounting and not do inflation. Yes, it's strange. You're then in a situation in which you're looking at future values on one project and not the other, right? The theory seemed to be that one project is going to require more later dollars than the other project, but if you're going to do that comparison, it would seem like you would have to look at inflation. This is a reflection of the fact that the methodology they used was invented in this case. They did provide the numbers both for the discounted and the non-discounted analysis, but the reason they invented this methodology was because a local official urged them to do it for the purpose of skewing the results because he was worried that otherwise the cost differential might be small enough to justify rehabilitation. We probably would like to talk about this issue more, but you've split up your time for us. Yes. Okay. Well, our reply brief addresses, unless the court has any other questions, our reply brief addresses many of these arguments. Just I guess one question that's just a little puzzling to me. If I'm understanding the agency's view, is it because the rehabilitation project will be using more dollars they won't get until the future, that makes it less attractive, correct? Less attractive to the DOT? Yes. They wanted a new bridge. They would rather do a project which needs the money today because of the way the government operates and how it appropriates. Isn't that their basic position? No. I wouldn't characterize their position that way. How would you characterize it? Ask them how they characterize their position. Well, I'm not sure I quite understand the question. That's fine. Thank you. Okay. Thank you, Your Honor. Please mute your audio and video. Attorney Dunitz, please unmute your audio and video and proceed with your argument. May it please the court. My name is Jonathan Dunitz from Veraldana, and I'm here on behalf of the Amicus Curia Waterfront, Maine, Brunswick LLC. My client and I would like to thank the court for granting an Amicus the opportunity to be heard by the court related to the important issues surrounding the destruction and replacement of the Frank J. Wood Bridge. Waterfront, Maine, owns and operates and has invested tens of millions of dollars and 30 years of effort rehabilitating the Cabot Mill, which is adjacent to the Frank J. Wood Bridge. Mr. Dunitz, your colleagues have pretty much used all your time, so we'll give you a little extra time, but you should get right to the point that you want to make as to why we should reverse. We should reverse because the process for decision-making was flawed. And one of the things that they looked at was one prime example of that flaw is that the DOT was concerned that the detour would be disruptive and therefore require this $4 million temporary bridge. But what they didn't consider was the real disruption for the businesses surrounding it, including Waterfront, Maine, that will suffer the disruption of 30 years of hard work and substantial investment preserving Maine history, the disruption caused by the impact the bridge will have on Waterfront, Maine's parking lot that is used by a popular restaurant in the building, or the disruption caused by making it more difficult to rehabilitate portions of Fort Andros. All of these disruptions have a financial impact on Fort Andros and on Waterfront, Maine's eligibility for tax credits. Did one of the parties to the agency proceeding raise these points? They did not. And then what basis would we have to even consider them? It's all part of the failure of the Maine DOT and the federal agencies to consider the impact on historic properties that are going to be impacted or used by the new bridge. And the rehabilitation of the old bridge would not have these impacts on Fort Andros or the Cabot Mill. Do you have any points that you want to make that were raised to the agency? Well, I believe that these are related to the points raised by the parties because it all goes to the failure of the agencies to consider the impact on historical properties by the decision to raise the bridge, the Frank J. Wood Bridge, and build a new bridge. So, although these specific facts were not necessarily raised, these all go to the failure to consider the impact on use of the historic bridge. Thank you. Thank you, Mr. Dunitz. Attorney Ingalls, please unmute your audio and video and proceed with your argument. Good morning. May it please the court. I'm Summer Ingalls here for the Federal Appellees. With me is the state of Maine. I plan to speak for eight minutes and the state plans to speak for seven. Together, we ask the court to affirm. Plaintiff's critiques of the agency's analyses are the sorts of pinprick criticisms that don't call the agency's ultimate conclusions into serious question. The Federal Highway Administration reasonably concluded that the rehabilitation alternatives would impose costs of an extraordinary magnitude. We don't have a huge amount of time and there's a lot going on in this case. So, could you make sure to address the point raised by the first of the counsel for appellants that we heard that in light of the district court's finding about the erroneous treatment of the construction costs, there's a need to vacate and remand because any argument for rehabilitating that aspect of the agency's decision depends on a theory about construction costs that the agency itself didn't manifest that it had decided the case on. Of course. First of all, we maintain that the cost analysis was reasonable and that each of the elements find support in the record. It's true that the district court expressed some skepticism about particular elements, particularly the steel and the trestle, but it recognized that on APA review, the question here is whether the agency's overall determination was reasonable. So, on page JA54, page 39 of the decision, the court said, I see cause to opine that certain cost differences were amplified to a degree, but not such a degree that the section for a final evaluation loses persuasive force or is deprived of it. Take the $600,000 figure on the structural steel. What do you point us to in the administrative record to show a basis for the agency to have included that differential in its calculations? Well, that's a very fine line item that perhaps could have been discussed in more detail, but it's a small element of an otherwise very complex accounting analysis. The plaintiff's arguments in the district court were not fully fleshed out. This was not a feature of their briefing. It's not been a feature of their briefing on appeal. My best arguments are that the suggestion that the cost should be the same to erect structural steel for the new steel girder bridge and for this very complex, nearly 90-year-old truss bridge are misleading. They're not materials costs. They're labor costs. And the rehabilitation alternatives require more than minor patching. They require an entirely new floor system. Did the other side argue in the agency that the structural steel prices, including labor, should be the same, should not have a $600,000 differential? I am not aware of any comments from the plaintiffs to the agency while this analysis was being completed to that effect. This has been a small argument throughout the proceedings. Again, it was not fully fleshed out in the district court, and it has come up on appeal. It was picked up by the district court. My best response is that this is a fine-grained criticism of an otherwise very complicated analysis that would show even if the $600,000 figure were somehow erroneous, there would be very substantial differences between the costs of these two alternatives, or three alternatives, two sorts of alternatives. If I hear you right, on this particular point, there seems to be two arguments you're making, one of which depends on us attributing to the agency a line of logic that it's not clear if engaged in, which would be some assessment of labor costs. Is this correct? It's true that the record doesn't expressly say these are the labor costs. The reason for the difference in the two costs in the accounting spreadsheets that the plaintiffs are looking at is because steel erection is an act. It's not a material cost. We don't know that the agency, if now it had to focus on that issue, would conclude that the labor costs would mean that the delta between the two was... We don't know what the delta would then come up with with respect to labor costs because there's nothing indicating it looked at that issue, correct? It's true that the agency didn't look to see how it would compare costs if the $600,000 were removed, but it shouldn't call the agency's overall analysis. That's your second argument. Your second argument is something about the number, the magnitude of this number, is too small to provide a basis for us overturning the agency decision, even if it got the number wrong. That's correct. What legal authority is there for that position? Because the thing that's a little difficult to figure out is given Chenery, we don't have a kind of typical harmless error analysis in the way that we do in reviewing, say, a district court's evidentiary ruling or something like that. So how do we... What guides us here in concluding that if there was a failure to consider something, we don't need to worry about it because that failure concerns something too small? I think my best response is that remand is only appropriate when it could result in a different outcome. When it would result in significant additional expense and delay, remand just isn't appropriate. I understand the court's concerns, but I think, again, it's important here to look broadly at what the agency had before it. Using the life cycle cost analysis, the rehabilitation alternatives were at least 50% more than the new bridge alternative, and they were double the cost of the new bridge alternative using the service life cost analysis method. Also... I'd just like to break in on the whole life cycle cost. If DOT is trying to determine what highway or what bridge to do without regard to historic preservation, you use your... or Maine DOT is doing it. You use these life cycle cost analysis, and I think as you pointed out, or maybe Maine DOT pointed out, maybe you want to also factor in social costs and impacts on communities and so forth. The reason we're looking at costs for this discussion is the framework of whether it is a feasible, prudent alternative. Under that analysis, you're required to consider a number of things, or you have a number of options. A severe disruption to established communities could be a factor. But you're not making that argument here. You're not saying that commuting around the three-minute or four-minute detour is a severe disruption. Then another is additional construction, maintenance, or operational costs of an extraordinary magnitude. Given that language... I'm looking here at the 23 CFR section 774.17 definitions here. Given that the costs you're talking about here are construction, maintenance, or operational costs, and there's a different area for talking about disruption to the community. Why did the commuting detour cost, which you could normally consider in a life cycle analysis when you're building a highway, but why does that come in here when you're trying to figure out for the historical preservation question? I think the plaintiff's briefing... May I answer the question? Inadvertently, muddy is the water here. The answer is that the overall conclusion here was that for all of the alternatives, the rehabilitation alternatives would impose costs of a substantial magnitude. The agency didn't need to consider each of those elements when it was designing the project itself. It was entirely reasonable for Maine DOT when it was designing the rehabilitation alternatives to say, let's complete a cost-benefit analysis here to figure out whether imposing this additional delay on the community makes sense when we're designing the project. Those factors apply to the comparison of the alternatives, but they don't dictate how the agencies plan the projects in the first place. I see that I've run out of time. Yes, I think you have a co-counsel who wishes to argue. We asked the court to affirm. I don't know how you split your time, but I would like one of you to address the rationale on life-cycle discounting. I don't know if that was your plan to do that. If your co-counsel's planning to do that, then I'd like to hear from whoever's most able to help us think through that issue is who I'd like to hear from on that question. I think we're both prepared to address all of the issues. I can turn to it very quickly. One of you will do it, but you're not going to be doubling your time. I understand. It's common, it's entirely appropriate not to include interest in this analysis. The life-cycle cost analysis accounts for interest, not inflation. In the primer cited in the appellant's reply brief, page 16 of that primer explains why inflation is not part of the analysis. The purpose is to ensure that these investing decisions reflect real gains in financial outcomes and not changes in cost based on inflation. In other words, if inflation and interest are the same, then they net out to zero and $4,000 per year would be the correct figure to aggregate. They could possibly cancel each other out, yes. On the other hand, normally what you'd do is you'd look to see if they do cancel out. And you haven't done that here. Yes, but that is the standard approach for this life-cycle cost analysis used across the government and as described in this primer cited in the reply. The standard approach is you don't count inflation, but you do discount to present value. That's the standard approach. Correct. You have a label here for a new approach, but service life costs. But really what you mean is that you're doing the life-cycle approach without discounting to present value. That's correct. I am sensitive about leaving time for the state of Maine. I know that he's able to address this as well. For now, the federal appellees ask the court to affirm. Thank you. Good morning, Your Honors. Deputy Attorney General Thomas Nolten for Maine DOT. We ask the court to affirm Judge Walker's decision. I want to focus right in on the structural steel erection costs that Judge Barron was asking about and the remand issue. The record does support the differential in these structural steel erection costs, $1.80 per pound for the rehabilitation alternative and $0.36 per pound for the replacement alternative. The record shows that those unit costs are based on MDOT bid history data. So the record... Could you give us some record citations here? Your Honor, they're in our brief. I know that... Yes, I can in one second. I know that one of the record sites takes us to the DOT bid specs, which is record item 21 at page 1283. Well, you don't need to do it now. I'll ask you to submit a letter within seven days referring us to those specific pages. You don't have to figure out which ones you meant in the brief. And I'll ask the opposing side to also submit a letter referring us to where in the appendix we should find that the two different figures for structural steel were challenged in the administrative agency. And that was the second point, Your Honor. I'm not sure that anybody ever made an issue of it. So I'm not sure that the agencies in the narrative of the decision to describe why it cost $1.80 a pound to erect the floor system for the rehabilitation alternative and only $0.36 a pound to erect the steel, the long steel girders for the replacement bridge. And below, this was a two-sentence argument in plaintiff's 40-page summary judgment brief, and we gave it an appropriate response. Judge Walker... Five minutes, counsel. Judge Walker wanted a little bit more, and we provided that to the court on appeal. Now, with respect to the remand issue that Judge Barron flagged, Judge Walker cited Curzon versus United States Postal Service, and we cited cases from the 10th Circuit, 11th Circuit, I believe, that essentially stand for the proposition that there's no reason to remand unless there's substantial doubt that the agency would reach a different, excuse me, doubt that they would reach the same result if an erroneous finding was removed. It's comparable to harmless error analysis if there's a small amount of... But how... Take the net present value. Suppose we were to agree with the other side on that present value. Then you're talking about a reduction of the differential by many millions of dollars. How do we say that the agency would have found the lower figure extraordinary? Your Honor, the agencies did do the lifecycle costs, and under the lifecycle costs, the rehabilitation alternative was 53% more expensive, and the plaintiffs have not disputed that a 53% additional cost is anything other than additional costs of extraordinary magnitude. Instead, what... The agency itself never expressed that view. The agency expressed the view that considering both estimated service life costs and lifecycle costs that there were additional costs of extraordinary magnitude associated with both of the rehabilitation alternatives. But the agencies did do the lifecycle cost analysis. Sure. They did both analyses, but as I read their actual decision at the end, I don't see where they said that even if the other lower cost was correct, we would still find extraordinary circumstances. They did not expressly make that sort of contingent finding. You're correct, Judge Gallardo, but they did do the calculation, and what's important is that the plaintiffs have not disputed that a 53% increase would be additional costs of extraordinary magnitude. Now, there are subsequent aspects of those cost items, but with respect to the fundamental question of whether 21 million versus 13.7 million, whether or not that represents additional costs of extraordinary magnitude, they have not made that argument. And is there anything that anyone is pointing us to that would quantify what an extraordinary means? Is this just you see it when you know it, and you see it? I'm not aware of any case or regulation that would quantify it. Here, it seems that a certainly 103% increase to get a rehabilitation, a rehabilitated bridge with a service life of only 75 years instead of 100 years that doesn't add a sidewalk for pedestrian safety is certainly additional costs of extraordinary magnitude. And the same could be said for a rehabilitated bridge that's 53% more expensive over 75 years that doesn't add a bridge on the east, excuse me, a sidewalk on the east side for pedestrian safety. Thank you. I think all your time has been used unless one of my colleagues has a question for Mr. Nolten. Thank you, Your Honor. Then we have some, I believe Ms. Furster reserved some time for rebuttal. Yes, one minute. Thank you. I'd like to start with the point that you may judge about the fact that there's really no standard for determining whether costs reach extraordinary magnitude. And that is because in the case law shows that costs are a subsidiary factor in all but the most unusual cases. So there's very little case law in which judgments have been made about what costs are costs of extraordinary magnitude. Although we do know stoppage case in California that a cost differential of $43 million was determined not to be a cost of extraordinary magnitude. And I'd also like... $43 million might go not quite as far in California as it does in Maine. But the point is that the agency needs to make that judgment in the context of the entirety of the project. And I would also refer you to footnote 14 on page 37 of our opening brief where we perform a calculation and it relates to the $4 million temporary bridge. If you see cost adjustment in this case... I'm counsel. Thank you. May I finish the sentence? Yes, please finish your sentence. If you make a cost adjustment that subtracts $4 million from the cost of the rehabilitation alternative along with the $600,000 adjustment that the district board acknowledged, you get to be a differential of only 5.9% between the rehab and the new bridge alternative. And I would just particularly like to say that there is absolutely no precedent in the state of Maine for building a costly $4 million temporary bridge to avoid a three to four minute detour. And there's none provided in the record. Thank you. Thank you, Ms. Furster. I take it you heard my request that you file within seven days a letter pointing us specifically in the record where the structural steel comparison differential was challenged. Yes. Yes, I'd be happy to do that. And I also... Is this a... These are simultaneous letters? Well, you're both giving us record sites. I don't think there'll be any game playing here. Just get it in seven days. Okay. All right. Thank you. We will do that. That concludes the argument for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.